IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

MEDICAID AND MEDICARE
ADVANTAGE PRODUCTS ASSOCIATION
OF PUERTO RICO, INC. ET AL.,

Plaintiffs,

v.                                                    CIV. NO.: 19-1940 (SCC)

DOMINGO EMANUELLI-HERNÁNDEZ
ET AL.,

Defendants.

## OMNIBUS OPINION AND ORDER

This matter arises from the government of Puerto Rico's attempt to address a major public health crisis afflicting the island for more than a decade: the mass exodus of medical professionals in pursuit of better economic opportunity elsewhere in the United States. However, in a display of the complexities of federalism, that worthy purpose has come into direct conflict with the public policy of the U.S. Congress in creating the Medicare Advantage program, resulting in the lawsuit before us today.

Plaintiffs Medicaid and Medicare Advantage Products Association of Puerto Rico, Inc. ("MMAPA"), MMM Healthcare, LLC ("MMM"), Triple-S Advantage, Inc. ("Triple-S"), MCS Advantage, Inc. ("MCS") and Humana Health Plans of Puerto Rico, Inc. ("Human") sued the

Attorney General and Insurance Commissioner of the Commonwealth of Puerto Rico ("Government Defendants")[1] in this Court. Plaintiffs alleged, *inter alia*, that the amendment to the Puerto Rico Insurance Code that added regulations to Medicare Advantage as administered in Puerto Rico and was aimed at addressing the flight of medical professionals from the island, Subsection 7 of Puerto Rico Act 90-2019, is preempted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. § 1395w-21 *et seq*. *See* Docket No. 1.

The remaining defendants intervened as a matter of right under Federal Rule of Civil Procedure 24(a)(2). *See* Docket Nos. 15, 26, 49, 72 and 90. Those parties consist of Asociación de Hospitales de Puerto Rico, Inc. ("AHPR"), Mennonite General Hospital, Inc. ("Mennonite"), Hospital Menonita Caguas, Inc. ("Menonita Caguas"), Hospital Menonita Guayama, Inc. ("Menonita Guayama"), San Jorge Children's Hospital ("San Jorge"), Clinical Laboratories Association Inc. ("CLA"), Puerto Rico Association of Radiology Imaging Centers Inc. ("PRARIC") and the Puerto Rico College of Physicians-Surgeons ("CMCPR") (collectively, the "Intervenor Defendants").

---

[1] The originally named defendants, Dennise Longo-Quiñones and Javier Rivera-Ríos, have since been substituted by Domingo Emanuelli-Hernández and Mariano A. Mier-Romeu, the current Secretary of the Department of Justice and Insurance Commissioner of Puerto Rico, respectively. *See* Docket Nos. 116 and 119.

Pending before the Court are the Government Defendants'
Motion to Dismiss at Docket Number 32; Plaintiffs' Cross-
Motion for Summary Judgment at Docket Number 48[2];
Plaintiffs' Motion to Dismiss Counterclaims at Docket
Number 110; and Plaintiffs' Motion for Expedited Decision on
Pending Motions or, in the alternative, for Preliminary
Injunction at Docket Number 114. All Defendants opposed
Plaintiffs' Cross-Motion for Summary Judgment, *see* Docket
Numbers 58 and 76, and the Government Defendants and
several Intervening Defendants opposed Plaintiffs' Motion
for Preliminary Injunction, *see* Docket Numbers 123 and 125.

Because Plaintiffs' Cross-Motion for Summary Judgment
does not rely on any facts beyond those iterated in the
pleadings, we convert that motion into a Motion for Judgment
on the Pleadings pursuant to Federal Rule of Civil Procedure
12(c).[3] Virtually no discovery has yet been conducted in this
case, and therefore no factual record beyond the Complaint
and subsequent pleadings exists upon which the Court may
rely in making its rulings, making summary judgment
premature. Plaintiffs even acknowledge as much in their
Cross-Motion for Summary Judgment, before ultimately
filing a skeletal Statement of Undisputed Facts in compliance

---

[2] Plaintiffs also opposed the Government Defendants' Motion to Dismiss
in the same motion.
[3] That Rule states, "After the pleadings are closed – but early enough not
to delay trial – a party may move for judgment on the pleadings." Fed. R.
Civ. P. 12(c).

with Local Rule 56(b) of this Court reciting the allegations from their Complaint. *See* Docket Nos. 48, pg. 11 n.2 and 105. Thus, the Court will treat Plaintiffs' Cross-Motion for Summary Judgment as a Rule 12(c) Motion for Judgment on the Pleadings. [4]

For the reasons stated herein, the Government Defendants' Motion to Dismiss at Docket Number 32 is DENIED, Plaintiffs' Motion for Judgment on the Pleadings (formerly a Cross-Motion for Summary Judgment) at Docket Number 48 is GRANTED and the remaining pending motions at Docket Numbers 110 and 114 are MOOT.

## I.      Factual and Procedural Background

Unless otherwise indicated, we derive the following factual summary from Plaintiffs' Complaint, Docket Number 1. As we must at the motion-to-dismiss stage, we construe all of Plaintiffs' factual allegations as true and make all reasonable inferences in their favor. *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998).

Medicare is a federal health insurance program established under Title XVIII of the Social Security Act for people over 65 years old and certain other qualifying beneficiaries. *See* Docket No. 1, ¶ 24.  It is administered by the

---

[4] In converting Plaintiffs' Cross-Motion for Summary Judgment into one for Judgment on the Pleadings, Defendants' arguments that summary judgment is premature and that the parties need first to develop a factual record pursuant to Federal Rule of Civil Procedure 56 are rendered moot. *See* Docket Nos. 58 and 112.

Centers for Medicare and Medicaid Services ("CMS"), an agency within the U.S. Department of Health and Human Services, and consists of four parts, one of which is most relevant here: Part C, also known as Medicare Advantage ("MA"). *See id.* at ¶¶ 25, 26.c. Under MA, private insurance companies contract with CMS to provide Medicare benefits, as well as coverage outside of Medicare. *See id.* at ¶ 26.c.

Under the traditional Medicare program, the government pays healthcare providers directly based on a fee-for-services schedule devised by CMS. *See id.* at ¶ 29. However, under MA, as revised by the Medicare Drug, Improvement and Modernization Act of 2003, 42 U.S.C. § 1395w-21 *et seq* (the "Medicare Advantage Act" or "Medicare Part C"), CMS contracts with the private Medicare Advantage organizations ("MAOs" or "MA plans"), who in turn contract with healthcare providers, to provide bundled Medicare plans to MA beneficiaries. *See id.* at ¶¶ 30-32. The MA scheme thus expanded Medicare beneficiaries' insurance choices to include private plans with coordinated care and more comprehensive benefits than those provided under traditional Medicare. *See id.* at ¶ 33.

Unlike the payment structure under traditional Medicare, MAOs do not receive fee-for-service reimbursements from the government for the services to their enrollees. *See id.* at ¶ 34. Instead, they receive a per-person monthly payment to provide coverage for all Medicare-covered benefits to

beneficiaries enrolled in the plan, a payment determined by CMS based on the difference between a plan's bid and the federal benchmark. *See id.* If the plan's bid is less than the benchmark, its payment from CMS is the bid plus a rebate, which must be returned to enrollees in the form of additional benefits or other options. *See id.* at ¶ 35. If the plan's bid is equal to or above the benchmark, its payment is the benchmark amount, and each enrollee in that plan will incur an additional premium to cover the amount by which the bid exceeded the benchmark. *See id.*

This payment structure was intended by Congress to improve "'the range of benefit choices available to enrollees and the opportunity to share in savings where MA plans can deliver benefits at lower costs,' to '[e]xpand the number and type of plans provided for, so that beneficiaries can choose from [different] types of plans,' and to '[u]se open season competition among MA plans to improve service, improve benefits, invest in preventative care and hold costs down in ways that attract enrollees.'" *Id.* at ¶ 37 (quoting Medicare Program; Establishment of the Medicare Advantage Program; Final Rule, 70 Fed. Reg. 4589 (Jan. 28, 2005)).

Indicative of just how far-reaching the implications of the outcome of this matter are, there are a myriad of parties participating in this case, including several intervening defendants. For purposes of clarity, we briefly sketch out the identity of those parties and the various claims and counterclaims that they have brought against one another.

### A.  *The Parties*

The Plaintiffs in this matter are made up of MMAPA, a trade organization that represents the leading MAOs of Puerto Rico, and several of its members, MMM, Triple-S, MCS and Humana (the "MAO Plaintiffs"). *See* Docket No. 1, ¶ 15. The MAO Plaintiffs, in turn, are private licensed health maintenance organizations ("HMOs") that have contracts with CMS, the federal agency that partners with the States to administer Medicaid, Medicare and other government healthcare programs. *See id.* at ¶¶ 16-21. Pursuant to those contracts, the MAO Plaintiffs offer Medicare Advantage ("MA") to the residents of Puerto Rico through various healthcare providers across the island. *See id.*

The Commonwealth of Puerto Rico is represented by the Secretary of the Department of Justice and Insurance Commissioner of the Commonwealth of Puerto Rico. The Intervenor Defendants consist of various healthcare providers, or organizations made up of those providers, that provide medical services to Medicare Advantage enrollees in

Puerto Rico and have contracts with the MAO Plaintiffs to do
so. *See* Docket Nos. 15, 26, 49, 72 and 90. These Intervenor
Defendants represent an enormous number of medical
services providers across the island: AHPR is a trade
organization comprised of sixty-seven of the seventy-seven
hospitals currently operating in Puerto Rico, as well as over
seventy other members providing healthcare services, *see*
Docket No. 15, pgs. 1-2; CLA and PRARIC represent over 120
laboratories and over forty radiology imaging centers,
respectively, *see* Docket No. 68, Exs. 1 and 2; and CMCPR is a
compulsory      membership    association    made    up    of
approximately 9,000 physicians licensed to practice medicine
in Puerto Rico, *see* Docket No. 72.

### B. *The Claims and Counterclaims*

Plaintiffs' principal claim is that Subsection 7 of Puerto
Rico Act 90-2019 P.R. Laws Ann. Tit. 26, § 1915 ("Act 90-
2019"), is preempted, whether expressly or under the
principle of conflict preemption by Medicare Part C. *See*
Docket No. 1, ¶¶ 57-67. They argue that Medicare Part C
contains an express-preemption provision that holds that the
Medicare Advantage Act supersedes any State laws
regulating MA plans. *See id.* at ¶ 58; 42 U.S.C. § 1395w-
26(b)(3). In Plaintiffs' view, Subsection 7, which prohibits
MAOs from agreeing on fees lower than those established by
CMS when contracting with healthcare providers and from

terminating such contracts without cause, is preempted by
Medicare Part C's express-preemption provision. *See* Docket
No. 1 at ¶¶ 44, 62. Moreover, Subsection 7 is in direct conflict
with Congress' purposes and objectives in enacting Medicare
Part C, which, according to Plaintiffs, were to promote
competition and innovation by allowing MA plans to freely
negotiate compensation and termination provisions with
providers. *See id.* at ¶¶ 3, 66. Plaintiffs also bring claims under
the Contracts Clause and the Takings Clause of the Fifth
Amendment to the U.S. Constitution.[5]

Plaintiffs seek a judgment from this Court declaring that
Medicare Part C preempts Subsection 7 of Act 90-2019 and
violates the Contracts Clause and Takings Clause to the extent
that it imposes minimum payment obligations on MAOs and
prohibits termination of contracts between MAOs and
providers without cause. *See id.*, pg. 19. They also seek a
permanent injunction enjoining Defendants from enforcing
Subsection 7. *See id.*

Defendants moved to dismiss Plaintiffs' Complaint,
mounting several defenses and arguing that Subsection 7 of
Act 90-2019 is not preempted by Medicare Part C, nor does it
impair Plaintiffs' right to contract in violation of the Contracts
Clause or constitute a taking under the Takings Clause such

---

[5] Because we find that Act 90-2019 is preempted by Medicare Part C under
the Supremacy Clause, as explained *infra*, we do not address the merits of
Plaintiffs' claims under the Contracts Clause and the Takings Clause.

that the claims should be dismissed under Federal Rule of
Civil Procedure 12(b)(6). *See* Docket No. 32. Defendants also
contend that they are entitled to Eleventh Amendment and
qualified immunity as to all claims, that Plaintiffs failed to
comply with Puerto Rico Law No. 104 requiring notice to the
Secretary of Justice and that the Court lacks federal subject
matter jurisdiction, all of which, in the Government
Defendants' view, warrant dismissal.

In response, Plaintiffs opposed the Government
Defendants' Motion to Dismiss and filed a Cross-Motion for
Summary Judgment. *See* Docket No. 48. Plaintiffs contend
that preemption is purely a legal question that is properly
resolved without factual development, and that the Court
should therefore rule summarily on Plaintiffs' two
preemption claims in Plaintiffs' favor. *See id.*, pgs. 10-16.

The Intervenor Defendants also filed counterclaims along
with their answers against Plaintiffs, arguing that Subsection
7 of Act 90-2019 is not preempted by Medicare Part C and that
that subsection does not violate the Contracts Clause nor the
Takings Clause. *See* Docket Nos. 101, 102, 103. Plaintiffs
moved to dismiss those counterclaims under Federal Rule of
Civil Procedure 12(b)(6), reiterating their arguments from
their opposition to the Government Defendants' Motion to
Dismiss. *See* Docket No. 110.

On January 7, 2021, Plaintiffs moved for an expedited decision on the Government Defendants' Motion to Dismiss and Plaintiffs' Cross-Motion for Summary Judgment, the pending cross-motions in this matter, or, in the alternative, that the Court issue a preliminary injunction reserving the *status quo* until it rules on the pending cross-motions. *See* Docket No. 114. Plaintiffs allege that, in response to complaints by Intervening Defendants and other parties, the newly seated Insurance Commissioner has commenced investigations into Plaintiffs and issued expansive and burdensome demands for document production as a means of enforcing Act 90-2019. *See id.* at pg. 1. Plaintiffs request that the Court enjoin the Commissioner from continuing such investigations pending the outcome of this action. *See id.* at pg. 2.

## II.     Legal Backdrop

### A.   *Jurisdiction*

The Government Defendants argue in their Motion to Dismiss that the Court lacks subject matter jurisdiction over this matter. It is axiomatic that federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). As such, whether this Court has subject matter jurisdiction over the present matter is a question that must necessarily be solved at the threshold

level. *See Lawless v. Steward Health Cares Sys., LLC*, 894 F.3d 9, 16 (1st Cir. 2018) ("Since the existence of federal subject-matter jurisdiction implicates our power to hear and determine a case, we must address that issue before proceeding further." (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). First, the Government Defendants attempt to argue that, in the absence of diversity jurisdiction, Plaintiffs fail to meet their burden of establishing in the Complaint the basis for federal question jurisdiction under 28 U.S.C. § 1331 for their preemption claims.

We find this argument unpersuasive. In the very first sentence of the Complaint, Plaintiffs clearly aver that "[t]his case is about federal preemption of a Puerto Rico law." Docket No. 1, ¶ 1. They also cite the U.S. Constitution as a basis for the Court's jurisdiction over the this matter, meaning that, in conjunction with the fact that the preemption claims flow from the Supremacy Clause of the U.S. Constitution, Plaintiffs' claims *ipso facto* "arise under" federal law for purpose of § 1331, even if the Supremacy Clause is not explicitly cited. See *id.* at ¶ 11; U.S. Const. art. VI, cl. 2; *Hillsborough Cnty. V. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) (explaining the relationship between the Supremacy Clause and the principle of preemption).

Next, the Government Defendants cite *Nashoba Commc'ns Ltd. P'ship No. 7 v. Town of Danvers*, 893 F.2d 435 (1st Cir. 1990) and *Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237 (1952) in support of their proposition that this suit is merely an anticipated defense in response to a possible suit by Defendants seeking to enforce Act 90-2019, which violates the "well-pleaded complaint rule."[6] However, Plaintiffs argue that the First Circuit has since solidified the principle that federal courts have subject matter jurisdiction over suits alleging federal preemption and seeking declaratory and injunctive relief against state agencies acting in a manner inconsistent with federal law, essentially abrogating *Nashoba*. We agree. *See Local Union No. 12004, United Steelworkers of America v. Massachusetts*, 377 F.3d 64, 72-75 (1st Cir. 2004). In *Local Union*, the First Circuit acknowledged the tension between *Wycoff*, upon which the *Nashoba* decision relies, and other Supreme Court jurisprudence, namely, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). *Id.* at 74. *Shaw* held that "[a] plaintiff who seeks injunctive relief from state regulation, on ground that such regulation is pre-empted by a federal statue which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the

---

[6] Under that rule, "a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)).

federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." 463 U.S. at 96 n.14. The First Circuit found that *Verizon Maryland Inc v. Public Service Comm'n*, 535 U.S. 635 (2002) explicitly reinforced the strength of the *Shaw* principle, thereby rendering the preemption holdings of *Nashoba, Wycoff* and their progeny toothless. The First Circuit in *Local Union*, interpreting *Verizon* and *Shaw*, held that in suits against state officials for declaratory and injunctive relief, like the one here, "a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action." 377 F.3d at 75. The First Circuit reasoned that the suit, as the one here, was "not merely the assertion of a federal issue that, but for the declaratory judgment device, would arise only as a defense to a state-law cause of action." *Id.*

The present case can also be significantly distinguished from *Nashoba* factually. In *Nashoba*, the plaintiff cable company bid on a contract with the defendant town to construct and operate a cable television system in the town, with the town asking the applicants if they would agree to honor a two-year rate freeze as part of the contract. 893 F.2d at 440. The plaintiff agreed and won the contract. *Id.* Thereafter, the plaintiff raised its rates and the town counsel responded with a letter stating that the rate hike was in violation of its contract and recommended sanctions. *Id.* at 436-37. The plaintiff then sued in federal court seeking

declaratory and injunctive relief from the "rate freeze"
provision of the contract, claiming it was preempted by the
federal Cable Act. *Id.* at 437. In finding a lack of federal
question jurisdiction, the First Circuit reasoned that the state
action in that case was "not regulation, it [was] enforcement
of a contractual commitment Nashoba proposed unilaterally,
in full awareness of the Cable Act." *Id.* at 440. Under this
reasoning, the First Circuit viewed the suit as merely an
anticipated defense to a state breach of contract claim by the
town, which is an insufficient basis for federal question
jurisdiction under the well-pleaded complaint rule. *Id.* at 437.

Here, on the other hand, the government of Puerto Rico
passed a law affecting Plaintiffs' already-existing contracts
with providers and regulating an area of Medicare Advantage
that the federal statute expressly states cannot be regulated by
the states. In that way, this case is more factually akin to
*Verizon* and *Local Union*, which dealt with state regulation in
contravention of federal law and a plaintiff seeking to enjoin
the enforcement of such regulation rather than anticipating a
defense to a state contract action stemming from the plaintiff's
breach of contract, resulting in findings in favor of federal
question jurisdiction. *Verizon*, 535 U.S. at 648; *Local Union*, 377
F.3d at 75. Here, Defendants do not allege that Plaintiffs have
breached their contracts with providers, which would lend
merit to their argument that this suit is merely an anticipated
defense to contract action; in fact, the contracts are not even

before the Court. Thus, the Government Defendants' reliance on *Nashoba* is misplaced, and that decision does not dictate a lack of federal question jurisdiction over the matter before us.

B. *Remaining Threshold Issues Raised in Government Defendants' Motion to Dismiss*

1. Eleventh Amendment and Qualified Immunity

In their Motion to Dismiss, Government Defendants argue that they are immune to the claims made against them under the Eleventh Amendment to the U.S. Constitution and under the doctrine of qualified immunity. *See* Docket No. 32, pgs. 6-11. They contend that a lawsuit against state officers acting in their official capacity is tantamount to a lawsuit against the state[7] itself, actions that are prohibited by the Eleventh Amendment. *See id*. at pg. 7; U.S. Const. amend. XI. In addition, they argue that qualified immunity also serves to bar the present action because "the complaint fails to properly plead that any of the appearing defendants violate a clearly established constitutional rights [*sic*]." *Id*. at pg. 11; *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (explaining that qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[7] Puerto Rico is considered a state for purposes of Eleventh Amendment protections. *Torres v. Puerto Rico Tourism Co.*, 175 F.3d 1, 3 (1st Cir. 1999).

which a reasonable person would have known" (quotation
marks and citations omitted)).

However, it is well-settled that the Eleventh Amendment
does not prohibit a suit against a state official when that suit
seeks only declaratory or prospective injunctive relief in order
to end an ongoing violation of federal law. *Ex parte Young*, 209
U.S. 123, 155-156 (1908); *see also Green v. Mansour*, 474 U.S. 64,
68 (1st Cir. 1985). Thus, under this so-called *Ex parte Young*
doctrine, the protections of the Eleventh Amendment are
limited to suits for monetary relief. *See Mills v. Maine*, 118 F.3d
37, 54 (1st Cir. 1997) (citing *Pennhurst State Sch. & Hosp. v.
Halderman*, 465 U.S. 89, 102-03 (1984)). Similarly, qualified
immunity does not block actions seeking to enjoin future
conduct and is only available to bar suits for damages. *See
County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998); *Lugo
v. Alvarado*, 819 F.2d 5, 7 (1st Cir. 1987).

The Government Defendants incorrectly state that
Plaintiffs seek both monetary and injunctive relief and
therefore the Eleventh Amendment and qualified immunity
serve to bar this lawsuit. *See* Docket No. 32, ¶ 28. Yet the
Complaint plainly requests only prospective declaratory and
injunctive relief regarding further enforcement of Act 90-2019.
Therefore, neither the Eleventh Amendment nor the doctrine
of qualified immunity deprives the Court of jurisdiction over
this matter as to the Government Defendants.

### 2. Puerto Rico Law No. 104

The Government Defendants also argue that Plaintiffs failed to comply with the notice requirements of Puerto Rico Law No. 104, P.R. Laws Ann. Tit. 32 § 3077a, which requires prior notification to the Secretary of Justice for actions against the Commonwealth of Puerto Rico. *See* Docket No. 32, pg. 12. However, that statute clearly states, and the Government Defendants even admit, that the notice requirement applies only to actions for damages. P.R. Laws Ann. Tit. 32 § 3077a; *see also* Docket No. 32, pg. 12 ("Failure to comply with the timely presentation of the written notice bars the judicial action of any kind against the Commonwealth of Puerto Rico for *damages* caused by a culpable or negligent act of the Commonwealth." (emphasis added)). The present action is one for declaratory and injunctive relief, not one for damages, and Puerto Rico Law No. 104 is therefore inapplicable here.

### III.   Analysis

#### A. *Standards of Review*

##### 1. Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

In order to survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure (12)(b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding whether this

standard has been met such that the plaintiff has raised "a right to relief above the speculative level," *id.* at 555, a court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008). However, the court must also "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz c. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). While a complaint need not give detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### 2. Judgment on the Pleadings

As mentioned, *supra*, we treat Plaintiffs' Cross-Motion for Summary Judgment as a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c) considering the absence of a factual record in this case. Rule 12(c) permits a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed," provided the motion does not delay the trial. Fed. R. Civ. P. 12(c). While a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c) are generally accorded the same treatment, a Rule 12(c) motion implicates all the pleadings, rather than the complaint alone. *Aponte-*

*Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54-55 (1st Cir. 2006). Because a Rule 12(c) motion, like a Rule 12(b)(6) motion, requires some assessment of the merits of the case at its nascence, "the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof." *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006) (citing *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).

    B. *Statutory Provisions at Issue*

        1.   The Medicare Prescription Drug, Improvement and Modernization Act of 2003, 42 U.S.C. § 1395w-21 *et seq*.

Medicare Part C, or Medicare Advantage, contains an express-preemption provision (the "Preemption Provision") that provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3).[8]

Furthermore, the statute states that, "in order to promote competition . . . the Secretary may not require any MA organization to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter or require a particular price structure

---

[8] This preemption provision is also codified at 42 C.F.R. § 422.402.

for payment under such a contract to the extent consistent with the Secretary's authority under this part." 42 U.S.C. § 1395w-24(a)(6)(B)(iii).

Also, relevant here, pursuant to an accompanying regulation by CMS, "[a]n MA organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause." 42 C.F.R. § 422.202(d)(4).

### 2.   Subsection 7 of Puerto Rico Act 90-2019

On August 1, 2019, the Legislative Assembly of Puerto Rico passed Act 90-2019, which amended section 19.150 of Law No. 77 of June 19, 1957, also known as the Insurance Code of Puerto Rico, by adding Subsection 7. *See* P.R. Laws Ann. Tit. 26 § 1915. Specifically, Subsection 7 prohibits MAOs from, among other things, (1) agreeing to accept fees from providers lower than those established for Puerto Rico by CMS for services provided as an MA provider (the "Mandated Price Provision"); and (2) terminating or rescinding a contract with a provider or health professional without just cause (the "Termination Provision"). *Id*. Any contract term inconsistent with such prohibitions is to be considered void. *Id.*

Additionally, in the bill that became Act 90-2019, the Puerto Rico Senate made explicitly clear its public policy reasons for amending the Insurance Code to include Subsection 7: it sought to address the "mass exodus of

medical professionals" from Puerto Rico at alarming rates by eliminating insurers' practice of paying providers below the minimum reimbursement rates paid by CMS under standard Medicare. *See* Docket No. 1, Ex. 2. In prohibiting such a practice, the Puerto Rico Senate intended to benefit providers in order to retain those medical professionals fleeing the island in pursuit of better economic opportunities. *Id*. It noted that Medicare reimbursement rates established by CMS for Puerto Rico physicians are lower than those established for physicians in any other state or territory of the United States. *Id.* Under the MA scheme, insurers in Puerto Rico like Plaintiffs pay rates even below the already-low rates paid by CMS under Medicare, thus encouraging the flight of medical professionals to other jurisdictions where reimbursement rates are higher. *Id.* According to the Puerto Rico Senate, the enactment of Subsection 7 was therefore necessary to meet this public health crisis that threatens the health of the citizens of Puerto Rico and the "compelling State interest of retaining the physicians who are leaving Puerto Rico." *Id.*

### C. *Preemption*

The principle of federal preemption flows from the Supremacy Clause of the U.S. Constitution, which "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough Cnty.*, 471 U.S. at 712 (internal quotations omitted); *see also* U.S. Const. art. VI, cl. 2. Because

the ability to nullify a state law[9] is an extraordinary power not to be exercised lightly, we "start with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Massachusetts Ass'n of Health Maint. Orgs. V. Ruthardt*, 194 F.3d 176, 178-79 (1st Cir. 1999). Those historic police powers traditionally include the health and safety of a state's citizens. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (internal quotations omitted)). Such a presumption "is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic*, 518 U.S. at 485. Following inexorably from this approach is the principle that "the purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).

---

[9] "The test for federal pre-emption of Puerto Rico law is the same as the test under the Supremacy Clause for pre-emption of the law of a State." *Puerto Rico Dep't. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 495 (1988).

Under the Supremacy Clause, federal law may preempt state law in various ways. First, preemption may be express, as "Congress is empowered to pre-empt state law by so stating in express terms." *Hillsborough Cnty.*, 471 U.S. at 713. In the absence of an express mandate by Congress or federal agency, state law is impliedly preempted if that law conflicts with federal law, meaning where "compliance with both state and federal law is impossible," or where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v ARC America Corp.*, 490 U.S. 93, 100 (1989). "In either situation, federal law must prevail." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). State law may also be preempted if federal law "so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the State to supplement it." *Cipollone*, 505 U.S. at 516 (internal quotations omitted); *see also Arizona v. U.S.*, 567 U.S. 387, 399-400 (2012). Moreover, the Supreme Court has made clear that state laws can be preempted "by federal regulations as well as by federal statutes." *Hillsborough Cnty.*, 471 U.S. at 713.

Where Congress expressly "ordained that its enactments alone are to regulate a [subject,] . . . state laws regulating that [subject] must fall." *Ruthardt*, 194 F.3d at 179 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). However, even where a statute contains an express preemption provision, the Court must assess the scope of that provision by discerning

the congressional purpose behind it. *See Medtronic*, 518 U.S. at
485-86. Such intent is primarily inferred from the text itself
and the "statutory framework" surrounding it, but it is also
revealed through "the reviewing court's reasoned
understanding of the way in which Congress intended the
statute and its surrounding regulatory scheme to affect
business, consumers, and the law." *Id.* at 486.

With that framework in mind, we turn to the federal and
state laws at issue, beginning with the plain language of the
Preemption Provision of the Medicare Advantage Act. That
clause states that the "standards established" under Medicare
Part C "shall supersede any state law or regulation (other than
State licensing laws or State laws relating to plan solvency)"
regarding MA plans offered by MAOs. 42 U.S.C. § 1395w-
26(b)(3). Defendants read this provision as preempting only
those state laws that overlap with an existing federal standard
under Medicare Part C. Plaintiffs, however, interpret the
modifying term "any" before "State law or regulation" and
the inclusion of the two listed exceptions to mean that
Congress intended for all state laws or regulations that
purports to regulate MA plans offered by MAOs (except those
relating to licensing and solvency), whether or not such laws
overlap with an existing federal standard, are preempted. We
agree with Plaintiffs. The Preemption Provision clearly states
in the broadest of terms that Medicare Part C supersedes all
regulation by the States of MA plans offered by MAOs, with

only two explicitly delineated exceptions, neither of which are applicable here. *See* 42 U.S.C. § 1395w-26(b)(3).

This interpretation, beyond being clear from the text of the statute itself, is supported by changes Congress made to the Preemption Provision in passing the Medicare Advantage Act. Prior to 2003, that provision stated that only state laws relating to specifically enumerated areas of Medicare+Choice (the earlier name for Medicare Advantage) were superseded by federal law. *See Ruthardt*, 194 F.3d at 178 (quoting the earlier version of the Preemption Provision). The Medicare Advantage Act removed that list and replaced it with the broad language that "*any* state law or regulation" (except for state licensing and solvency) is superseded by federal law. 42 U.S.C. § 1395w-26(b)(3) (emphasis added).

Besides, the legislative history of the Preemption Provision clarified that "the Medicare Advantage Program is a federal program operated under Federal rules and that State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." *First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 51 (1st Cir. 2007) (internal quotations omitted); *see also N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 74 (1st Cir. 2006) (explaining that, in determining the preemptive scope of a congressional enactment, courts rely on a statute's legislative history, in addition to its plain language, to develop "a reasoned

understanding of the way in which Congress intended the statute" to operate).

Statements made by CMS in the Federal Register, cited by Plaintiffs,[10] are also illuminating. CMS clarified that in 2003, the Medicare Advantage Act amended the Preemption Provision "by eliminating the general and specific preemption distinctions . . . and expanded Federal preemption of State standards to broadly apply preemption to all State law regulation (other than [licensing and solvency laws])." 70 Fed. Reg. 4664. According to CMS, Congress intended to "fully preempt State laws" and emphasized that "Medicare is a Federal program and that State laws should not apply." *Id.* In response to the changes to the Preemption Provision, CMS revised § 422.402 (the Preemption Provision's regulatory counterpart) "to clearly state that MA standards supersede State law and regulation with the exception of licensing laws and laws relating to plan solvency." *Id.* at 4663.

---

[10] To clarify, our consideration of CMS's statements of intent contained within the Federal Register do not amount to consideration of documents outside the pleadings such that summary judgment is appropriate, as Plaintiffs incorporate by reference that document into the Complaint. *See* Docket No. 1, ¶¶ 37, 53 n.3 and 54. When ruling on a 12(b)(6) motion to dismiss, "[a] district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (quoting *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)); *see also Young v. Lepone*, 305 F.3d 1, 10-11 (1st Cir. 2002) (finding it proper for the district court to consider letters excerpted and referenced in the complaint when ruling on a 12(b)(6) motion to dismiss).

Put plainly, "with those exceptions, State laws do not apply to MA plans offered by MA organizations." *Id.* CMS even goes as far as saying that the changes made by the Medicare Advantage Act "relieve[ ] uncertainty of which State laws are preempted by 'preempting the field' of State laws other than State laws on licensing and solvency." *Id.* at 4694.

Thus, both the text and the "surrounding regulatory scheme," *Medtronic*, 518 U.S. at 486, compel the conclusion that the Mandatory Price Provision and the Termination Provision of Act 90-2019, which purport to regulate areas of Medicare Advantage in Puerto Rico not falling within the exceptions of licensing and solvency, are expressly preempted by the Medicare Advantage Act, regardless of whether they conflict with any standards under that statute.

Defendants contend that the Preemption Provision only preempts state laws relating to "MA plans," and that contracts between MAOs and healthcare providers fall outside of the scope of that term. According to Defendants, states are not prohibited from regulating matters unrelated to MA plan standards, such as the circumstances of a MAO and provider contractual relationship. In support of this argument, the Government Defendants in their Motion to Dismiss cite several cases in support of this contention, each

of which is distinguishable from the present matter.[11] In *Med.
Card Sys. V. Equipo Pro Convalecencia*, 587 F.Supp.2d 384
(D.P.R. 2008) and *MMM Healthcare, Inc. v. MCS Health Mgmt.
Options*, 818 F.Supp.2d 439 (D.P.R. 2011), the court addressed
whether the Preemption Provision of Medicare Part C
preempted contract claims between MAOs and healthcare
providers, finding in the negative. That is not the issue before
us; today we rule on whether the Preemption Provision
preempts a state law regulating the way MAOs pay providers
for MA services and terminate their contracts with those
providers, not whether those parties may bring contract
claims before the Court.

In *Vega-Ramos*, the issue was whether a state law excluding
an insurer from a state-run program designed to extend full
prescription drug coverage to Puerto Rico residents eligible
for Medicare and Medicaid was preempted by the
Preemption Provision. 479 F.3d at 47, 52. The court found that
the agency empowered by the law to exclude the insurer was
not setting a standard for the operation of an MA plan
operating under Medicare, but "acting to protect the integrity
of the Puerto Rico Medicaid system in its role as the
Commonwealth's Medicaid administrator." *Id.* at 52.

---

[11] We do not address the state court cases nor cases from other federal
jurisdictions cited by the Government Defendants, as we find them
unpersuasive and we are not bound by their holdings.

Therefore, the preemption provision did not apply to knock down the state law. *Id.* In contrast, the state law at issue here does set a standard for the operation of an MA plan operating under Medicare, and *Vega-Ramos* is therefore inapposite.

Our decision today is made in full recognition of the severity of the public health crisis that Act 90-2019 is meant to address. However, we cannot ignore the "fundamental tenet of our system of federalism that constitutionally enacted federal law is supreme to state law." *Rowe*, 448 F.3d at 74. Under that principle, and because we find that the Mandatory Price Provision and the Termination Provision fall within the ambit of the Preemption Provision, we hold that Subsection 7 of Act 90-2019 is preempted by the Medicare Advantage Act.

## IV.   Conclusion

Having carefully examined the arguments raised by the parties, the Government Defendants' Motion to Dismiss at Docket Number 32 is DENIED, Plaintiffs' Motion for Judgment on the Pleadings (formerly a Cross-Motion for Summary Judgment) at Docket Number 48 is GRANTED and the remaining pending motions at Docket Numbers 110 and 114 are MOOT. Having granted

Plaintiffs' Motion at Docket Number 48, we accordingly enter a declaratory judgment that Subsection 7 of Puerto Rico Act 90-2019 is expressly preempted by the Medicare Prescription Drug, Improvement and Modernization Act of 2003, 42 U.S.C. § 1395w-21 *et seq.*

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 1st day of March 2021.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE